**Arlo J. SCHOENROCK, Plaintiff and Appellant,**

v.

**Lee A. TAPPE, Defendant and Appellee.**

**No. 15484.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 19, 1987.

Decided Jan. 27, 1988.

Randolph F. Stiles, Hanson, Stiles, Anderson & Swank, Mitchell, for plaintiff and appellant.

Carleton R. Hoy of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

MILLER, Justice (on reassignment).

This is a legal malpractice action which was dismissed by the trial court on the ground that the action was barred by the statute of limitations, SDCL 15–2–14.2. We affirm, reiterating that the statute of limitations is an occurrence rule, extending the continuous treatment doctrine to legal malpractice actions, but determining that under the facts presented here the statute of limitations bars the action as a matter of law.

### FACTS

Appellant Arlo J. Schoenrock (Schoenrock) commenced this lawsuit claiming in his first cause of action that Attorney Lee Tappe (Tappe) was negligent in rendering a title opinion to him. In his second cause of

action, Schoenrock alleged that Tappe failed to correct defects in the title after promising that he would do so.

Because consideration of the time frame is critical to this decision, the salient events will be set forth below in chronological order.

1. In October, 1980, Schoenrock entered into a contract to purchase three quarters of land from Raymond and Viola Sturgeon. He had previously leased this land from Sturgeons.

2. On February 20, 1981, Tappe rendered to Schoenrock a title opinion as designated attorney for the U.S. Farmers Home Administration (FmHA). The title opinion is on a standard FmHA Preliminary Title Opinion form showing Schoenrocks as loan applicants and applicants for the title examination.

This title opinion failed to mention that the property was subject to a certain wildlife easement to the United States Department of the Interior, U.S. Fish & Wildlife Service (Wildlife Service). The wildlife easement had been given by a prior owner in 1964 and contained various perpetual restrictions on the use of the land in order to provide for certain waterfowl production areas. It, among other things, specifically prohibits the drainage of lakes, ponds, sloughs, and similar conditions of the land. (Schoenrock was generally familiar with the provisions of such easements as some existed on other lands he had previously acquired.)

3. In March, 1981, Schoenrock had the land ditched and drained, contra to the restrictions on the easement.

4. In March (or possibly April) 1981, Schoenrock went to Tappe's office to retrieve the abstracts on the property. At that time, Schoenrock noted the wildlife easement entered on the abstract and asked Tappe about it. Schoenrock claims that Tappe told him it was nothing to be concerned about and that if Schoenrock had a problem with the easement that Tappe would take care of it. Tappe has no recollection of this conversation. Tappe's first recollection of a conversation dealing with the easement is in November 1984, which

conversation will be referred to later in this chronology.

5. In April, 1981, Schoenrock received a certified letter from Wildlife Service informing him of the wildlife easement on the subject property. He did not contact Tappe.

6. In February, 1983, Schoenrock met with representatives of Wildlife Service and the United States Attorney to discuss problems caused by his ditching and draining the land contrary to the easement. Schoenrock did not contact Tappe, but rather consulted another attorney with whom he "usually" dealt.

7. In the summer of 1983, according to his complaint, Schoenrock was again contacted by the Wildlife Service and advised that he still had a problem and that he should take corrective action or face litigation by the federal government. Schoenrock did not contact Tappe.

8. On February 20, 1984, three years had passed since Tappe issued the title opinion.

9. In March or April of 1984, three years had passed since Schoenrock retrieved the abstracts from Tappe and had the claimed conversation that Tappe would take care of any problems arising from the existence of the easement.

10. In November, 1984, *for the first time since March or April 1981*, Schoenrock contacted Tappe about the easement problem. (There is no mention of this contact in Schoenrock's complaint.) This is Tappe's earliest recall of any discussion concerning the omission of the easement from the title opinion. In any event, Tappe unsuccessfully attempted to assist Schoenrock by making various contacts with Wildlife Service and the South Dakota congressional delegation.

11. In the fall of 1984, after being unsuccessful in negotiating with Wildlife Service, Schoenrock filled the drainage ditches and generally returned the land to its previous condition.

12. On November 25, 1985, Schoenrock's attorney signed the summons and

complaint initiating this action. It is not clear from the record when the action was actually commenced, since the record is silent as to when the pleadings were served on Tappe. There is no certificate of service or admission of service in the file. Although the summons and complaint are dated in November, 1985, they were not filed with the clerk of courts of Charles Mix County until January 21, 1986. The first document actually filed in the case was an Order Disqualifying All Circuit Judges entered by Presiding Judge Hertz on January 2, 1986, which was filed on January 3, 1986. Tappe's answer and motion to dismiss is dated April 18, 1986, and was filed on May 20, 1986.

## DECISION

Pursuant to a motion for summary judgment, the trial court found that the action was barred by the statute of limitations [1] and dismissed the action. This appeal followed.

## THE STATUTE OF LIMITATIONS AS AN OCCURRENCE RULE

The statute of limitations is found at SDCL 15-2-14.2 and reads as follows:

> An action against a licensed attorney, his agent or employee, for malpractice, error, mistake or omission, whether based upon contract or tort, can be commenced only within three years after the alleged malpractice, error, mistake or omission shall have occurred. This section shall be prospective in application.

Schoenrock contends that summary judgment was improper because, as a matter of law, the statute of limitations did not begin to run until he sustained some injury, which he claims did not occur until he finally reconverted his land to its original condition.[2]

In effect, Schoenrock urges us to interpret South Dakota's statute of limitations as embodying the "date of damage" rule to determine when the statute begins to run for attorney malpractice actions. However, in South Dakota, neither the legislature nor this court's decisions apply this rule.

> The general rule is that in the absence of an attorney's fraudulent concealment of his negligent advice, the statute of limitations on a claim of attorney malpractice begins to run at the time of the alleged negligence and not from the time when the negligence is discovered or the consequential damages are imposed. *See* Annot. 18 A.L.R.3d 978, 986–87 (1968).

*Hoffman v. Johnson,* 374 N.W.2d 117, 122 (S.D.1985); *see generally* Annot., When Statute of Limitations Begins to Run Upon Action Against Attorney for Malpractice, 32 A.L.R.4th 260 (1984); R. Mallen and B. Levitt, *Legal Malpractice* §§ 389, 390, 393 (1981); D. Meiselman, *Attorney Malpractice: Law & Procedure* §§ 5.4, 5.6, 5.7 (1980) (discussing the injury, discovery and occurrence rules).

Although our *Hoffman* decision actually applied another statute of limitations which was in effect before the enactment of SDCL 15-2-14.2, the court observed that the clearly expressed legislative intent of both SDCL 15-2-14.1 (medical malpractice) and SDCL 15-2-14.2 was to have the statute run from the date the alleged malpractice *occurred. Hoffman, supra, citing Holy Cross Parish v. Huether,* 308 N.W.2d 575 (S.D.1981); *Alberts v. Giebink,* 299 N.W.2d 454 (S.D.1980). Under the "occurrence rule" as expressed by our statute, a cause of action for negligently examining a title accrues at the time the attorney provides the client with the erroneous information, in effect, when the omission occurs. *Attorney Malpractice, supra,* § 5:12 at 90,

---

**1.** Although the trial court's memorandum opinion mentions the wildlife easement as "a matter of public record," which Schoenrock had knowledge of, the sole basis for the motion for summary judgment was the statute of limitations. We consider the statute of limitations issue as the only question clearly presented to and decided by the trial court.

**2.** We emphasize that we express no opinion on the question of whether Tappe's examination of the title was, in fact, negligent. *See* SDCL ch. 43-30, appendix, standard 1.1 (attitude of attorney examining title). We are deciding only the peripheral question of whether an action for his *alleged* negligence may be barred by the statute of limitations.

n. 14. Thus, in this case, South Dakota's "occurrence rule" statute of limitations would normally run from the time that Tappe rendered the erroneous title opinion, which was in February, 1981, and the action would normally have been barred after February, 1984.

## THE CONTINUING REPRESENTATION RULE

The running of our "occurrence rule" statute of limitations would normally be an easy matter to calculate from the date of an erroneous title opinion. Schoenrock, however, also presents us with the issue of whether the "continuing treatment doctrine" should be applied to prevent the statute of limitations from running in a legal malpractice action.

In applying the continuing treatment doctrine to medical professionals, we have held that a medical professional's continuing treatment of a patient, which serves as the basis for a malpractice action, prevents a statute of limitation from running until the treatment ceases. *Wells v. Billars*, 391 N.W.2d 668 (S.D.1986); *see also Alberts v. Giebink, supra.* Other courts, which have applied the continuous treatment doctrine to medical malpractice actions, have also extended it to legal malpractice actions. *Siegel v. Kranis*, 29 A.D.2d 477, 288 N.Y.S. 2d 831 (1968); *see, generally, Legal Malpractice, supra,* § 391. *See also Amfac Distribution Corp. v. Miller*, 138 Ariz. 155, 673 P.2d 795 (App.1983), *approved as supplemented*, 138 Ariz. 152, 673 P.2d 792 (applying the discovery rule); *Wall v. Lewis*, 393 N.W.2d 758 (N.D.1986) (applying the discovery rule); *McCormick v. Romans*, 214 Va. 144, 198 S.E.2d 651 (1973).

■ We now hold that the "continuing treatment doctrine" applies not only to medical malpractice actions but is also extended to legal malpractice actions. However, for the reasons outlined below, an application of the continuous representation doctrine to the facts of this case will not save Schoenrock's cause of action.

## APPLICATION OF CONTINUOUS REPRESENTATION DOCTRINE

Schoenrock argues that a continuous representation occurred in March or April of 1981, at which time Tappe made the disputed comment that he would take care of the easement problem thus saving Schoenrock's case from the statute of limitations. Schoenrock further argues that Tappe's unsuccessful attempt to resolve the matter through South Dakota's congressional delegation in November, 1984, could be viewed (by a jury) as evidence of the continuing representation.

First, statute of limitations questions are normally for the jury. *Jewson v. Mayo Clinic*, 691 F.2d 405 (8th Cir.1982); *Schenebeck v. Sterling Drug, Inc.*, 423 F.2d 919 (8th Cir.1970); *Sam v. Balardo*, 411 Mich. 405, 308 N.W.2d 142 (1981); *Noland v. Freeman*, 344 N.W.2d 419 (Minn.1984); *Grondahl v. Bulluck*, 318 N.W.2d 240 (Minn.1982); *McCarthy Bros. v. Hanskutt*, 29 S.D. 535, 137 N.W. 286 (1912). Schoenrock asserts that there is a genuine issue of fact regarding whether Tappe agreed to do something to assist him with the easement problems in March or April of 1981. Even assuming such a factual dispute, the statute of limitations issue still remains, *under the facts of this case*, a question of law within the exclusive province of the court. *Tonegatto v. Budak*, 112 Mich.App. 575, 316 N.W.2d 262 (1982).

■ Reiterating, the statute of limitations period for legal malpractice actions is three years (SDCL 15–2–14.2) and a cause of action for negligently examining a title accrues at the time the attorney provides the client with the erroneous information (occurrence rule). Further, under the continuous representation doctrine, the accrual of a malpractice cause of action will be tolled until the "representation" (or "treatment" in medical malpractice cases) terminates. *Legal Malpractice, supra,* § 391 at 462–63; see cases cited in Koffler, Legal Malpractice Statutes of Limitations: A Critical Analysis of a Burgeoning Crisis, 20:2 Akron Law Review 209 (1986); Annot., 32 A.L.R.4th 260, *supra.*

We hold, however, that the continuous representation doctrine applies only to malpractice actions when there is a "clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney...." *Muller v. Struman,* 79 A.D.2d 482, 485, 437 N.Y.S.2d 205, 208 (1981) *citing Citibank, NA v. Suthers,* 68 A.D.2d 790, 418 N.Y.S.2d 679 (1979); *Grago v. Robertson,* 49 A.D.2d 645, 370 N.Y.S.2d 255 (1975); *Siegel v. Kranis, supra; see also Peduto v. Durr,* 97 A.D.2d 959, 468 N.Y.S.2d 953 (1983). This relationship is one "which is not sporadic but developing and involves a continuity of the professional services from which the alleged malpractice stems." *Muller, supra* 437 N.Y.S.2d at 208. Furthermore, the application of this doctrine should only be applied where the "professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship." *Muller, supra* 437 N.Y.S.2d at 207 *citing inter alia Naetzker v. Brocton Central School Dist.,* 50 A.D.2d 142, 376 N.Y. S.2d 300 (1975) *rev'd on other grounds* 41 N.Y.2d 929, 394 N.Y.S.2d 627, 363 N.E.2d 351 (1977); *Tool v. Boutelle,* 91 Misc.2d 464, 398 N.Y.S.2d 128 (1977); *Dura–Bilt Remodelers v. Albanese,* 86 Misc.2d 172, 382 N.Y.S.2d 455 (1976). *See generally Wells v. Billars,* 391 N.W.2d 668 (S.D. 1986).

The above considerations, which are normally indicative of a continuous attorney/client relationship, simply are not present in this case.

Here, *three years and seven months had passed with no contact whatsoever* between the parties. The Tappe–Schoenrock relationship was sporadic, at best. During the three-year seven-month gap, Tappe did nothing to make Schoenrock believe he was doing anything to remedy the easement problem. Nor did Schoenrock, who knew of the problem and was constantly in battle with the Wildlife Service over the situation, contact Tappe or in any manner inquire whether Tappe was doing anything to alleviate the problem.

In fact, Schoenrock dealt with *another* attorney. There simply was no continuity in the parties' relationship. The record does not support that the attorney/client relationship was in effect (if ever) after April, 1981. *See Muller, supra.*

Tappe's alleged comments made in April of 1981 were definitely related to the work performed in February of 1981. The November, 1984, work was also "related" to the February, 1981, work. However, the "continuity" element is missing from the November, 1984, representation. Obviously, there was a three-year nine-month gap between the November, 1984, work and the February, 1981, act (alleged erroneous title opinion) and a three-year seven-month gap if we apply the continuous representation doctrine to the April, 1981, contact. Therefore, the statute of limitations had run. *Bennin v. Ramapo General Hospital,* 72 A.D.2d 736, 421 N.Y.S.2d 243 (1979) (medical malpractice); *Tool v. Boutelle,* 91 Misc.2d 464, 398 N.Y.S.2d 128 (1977). Additionally, Schoenrock's contact with Tappe in November of 1984, purportedly to seek help in rectifying the error previously made, *will not* revive the cause of action after the statute of limitations has already run. *See Tonegatto, supra; Bennin, supra; Tool, supra citing Naetzker, supra.*

Schoenrock argues that Tappe's unsuccessful attempt to resolve the matter through South Dakota congressional delegation in November of 1984 might be viewed by a jury as a continuous representation. We disagree. As stated earlier, by November of 1984, the statute of limitation *had already run.* How long should Tappe's alleged comment, even if agreed to be true, remain effective? Three years? Six years? The legislature has said three years and we so hold, unless there is a continuous representation *within* the period of limitations. *See generally Wells, supra.* This is the most important factor in this case (i.e., a total absence of any claimed continuing representation *within the period of limitations*). The only claimed negligence is the alleged negligent title opinion, which was completed in February of 1981. Schoenrock's return to

Tappe's office in April of 1981 could arguably be characterized as a "continuing representation," within the limitation period, which would toll the statute from running until that time. *Citibank, supra.* However, Schoenrock's return to Tappe in November of 1984 does not toll the statute to this date, as this contact was at least seven months past the expiration of the three-year statute of limitations. *Citibank, supra; Peduto, supra; Tool, supra; Bennin, supra; Wells, supra.* Although the attorney cannot terminate the attorney/client relationship unilaterally by simply failing to provide services, "the relationship does not continue indefinitely simply because there is no formal termination." *Vollgraff v. Block*, 117 Misc.2d 489, 492, 458 N.Y.S.2d 437, 439 (1982).

Schoenrock relies on *Wells*, in asserting that Tappe was still representing Schoenrock in November of 1984, and claims that this may toll the cause of action for the negligent February, 1981, act. However, the complaint alleges *nothing* about the November, 1984, visit. Furthermore, in *Wells*, there was a "continued treatment" (as it was a medical malpractice case) *within* the original period of limitations. Here, the alleged "continued representation" was not within the period of limitations and thus the statute bars Schoenrock's action.[3]

Lastly, even considering the alleged conversation between Tappe and Schoenrock in March or April, 1981, together with the fact that Schoenrock did not go see Tappe until November of 1984, the only possible way Schoenrock could prevail is if he could make some type of a "discovery" time argument, by establishing that he did not discover the malpractice until some time which appropriately tolled the statute. *See Glad v. Gunderson, Farrar, Aldrich*, 378 N.W.2d 680 (S.D.1985). In *Glad*, we stated that "this statute of limitations ... will be tolled until the cause of action is discovered or might have been discovered, if there is fraudulent concealment of the cause of ac-

tion." *Id.* at 682 (citations omitted). Here, however, there was no claim of fraudulent concealment and no evidence of the same.

Therefore, the trial court is affirmed.

WUEST, C.J., and KONENKAMP, Circuit Judge, concur.

MORGAN, J., concurs specially.

HENDERSON, J., dissents.

KONENKAMP, Circuit Judge, sitting for SABERS, J., disqualified.

MORGAN, Justice (concurring specially).

I concur specially to note my basic disagreement with the opinion of this court in *Wells v. Billars*, 391 N.W.2d 668 (S.D. 1986), upon which Schoenrock bases his claim. *Wells* relied on *Alberts v. Giebink*, 299 N.W.2d 454 (S.D.1980), for the so-called "continuing treatment rule," but the majority in *Wells* failed to recognize that *Alberts*, a medical malpractice case, involved the alleged negligence of leaving a foreign body in a surgical patient. This type of negligence is treated as an exception to the usual rules of medical malpractice. I recognize that *Wells* is now the settled law and I do not have the votes to overturn it, but since, even under the *Wells* decision, the statute of limitations is not tolled, I can otherwise concur in the majority opinion.

HENDERSON, Justice (dissenting).

Let us first review the procedural background.

Plaintiff brought this lawsuit alleging in his first cause of action that attorney Lee Tappe was negligent in rendering a title opinion for him in February 1981. Plaintiff's second cause of action alleged that Tappe negligently failed to correct defects in the title after promising that he would do so. The circuit court granted Tappe's motion for summary judgment, which was made on the grounds that the malpractice action had been commenced in 1986 and

---

**3.** Trial judges should note that in cases such as this, where it is extremely important to ascertain the date when the statute of limitations begins to run or is tolled, special interrogatories to the jury will be necessary to clearly deter-

mine the factual issues (affecting the application of the statute of limitations and/or the continuous representation doctrine). *See McCarthy Bros., supra.*

was barred by the statute of limitations requiring such actions to be brought within three years of the alleged malpractice, SDCL 15–2–14.2.[1] Plaintiff appeals. I would reverse and remand.

We must now review the facts.

After leasing three quarters of land from Raymond and Viola Sturgeon for several years, plaintiff exercised his option to purchase the land from them. In conjunction with the purchase, Tappe rendered a title opinion in February 1981. The opinion failed to mention a wildlife easement which existed on the property. There was evidence that plaintiff and the Sturgeons may have discussed the existence of wildlife easements. Plaintiff was acquainted with the nature of wildlife easements as some existed on his own property.

In March or April of 1981, when plaintiff picked up the abstracts in Tappe's office, he noted a wildlife easement contained in the abstracts and asked Tappe about it. Although plaintiff claimed Tappe told him it was nothing to be concerned about and that, if plaintiff had a problem with it, Tappe would take care of it; Tappe has no recollection of this conversation.

In March 1981, plaintiff had the land ditched and drained. Although the Fish and Wildlife Service was not aware of the work plaintiff had done, they informed plaintiff, by letter, of the wildlife easement. Finally, in February 1983, plaintiff met with the United States Attorney and the Fish and Wildlife Service to discuss the problem of ditching and draining of the land contrary to the easement. Immediate-

ly after this meeting with the federal officials, plaintiff contacted another attorney who he "usually" consulted.

Tappe's earliest recall, relative to a discussion with plaintiff on the absence of an easement from the title opinion, was November 1984, when plaintiff came into Tappe's office again. Tappe made some contacts with South Dakota's congressional delegation and the Fish and Wildlife Service, to include a trip from Platte to Lake Andes, South Dakota, but was not successful in resolving the problem.[2] He also recalled advising plaintiff he might want to seek other counsel.

Plaintiff was able to avoid the Fish and Wildlife Service's requests to return the land to its previous condition until the Fall of 1984. After plaintiff was unable to negotiate with them about the easement, he had the drainage ditches filled and returned the land to its previous state.

First, I shall discuss the statute of limitations as an occurrence rule.

Plaintiff contends that summary judgment was improper because, as a matter of law, the statute of limitations did not begin to run until he sustained some injury, which he claims did not occur until November 1984 when he finally reconverted his land to its original condition.[3]

In effect, plaintiff urges us to interpret South Dakota's statute of limitations as embodying the "date of damage" rule to determine when the statute begins to run for attorney malpractice actions. Unfortunately, in South Dakota, neither the legisla-

---

1. SDCL 15–2–14.2 provides:

   An action against a licensed attorney, his agent or employee, for malpractice, error, mistake or omission, whether based upon contract or tort, can be commenced only within three years after the alleged malpractice, error, mistake or omission shall have occurred. This section shall be prospective in application.

   Although the trial court's memorandum opinion also makes a very brief mention of the wildlife easement as "a matter of public record," which plaintiff had knowledge of, the sole basis for the motion for summary judgment was the statute of limitations; therefore, I consider the statute of limitations issue as the only question clearly presented to and decided by the trial court.

2. Plaintiff had to secure an FmHA loan. Tappe knew that plaintiff had to rely upon his opinion to obtain the loan; plaintiff needed a merchantability opinion. Plaintiff secured the loan. Tappe's title opinion did not reflect a waterfowl easement even though the abstract contained such an easement.

3. I cannot express an opinion on the question of Tappe's examination of the title as being negligent. *See* SDCL ch. 43–30 app., Standard 1.1 (attitude of attorney examining title). This Court is deciding only the peripheral question of whether an action for his *alleged* negligence may be barred by the statute of limitations.

ture nor this Court's decisions apply this rule.

The general rule is that in the absence of an attorney's fraudulent concealment of his negligent advice, the statute of limitations on a claim of attorney malpractice begins to run at the time of the alleged negligence and not from the time when the negligence is discovered or the consequential damages are imposed. *See* Annot. 18 A.L.R.3d 978, 986–87 (1968).

*Hoffman v. Johnson,* 374 N.W.2d 117, 122 (S.D.1985); *see also Rosnick v. Marks,* 218 Neb. 499, 357 N.W.2d 186 (1984) (applying "act or omission" statute of limitation); *see generally* Annot., 32 A.L.R.4th 260 (1984); R. Mallen & V. Levit, *Legal Malpractice* §§ 389, 390, 393 (2d ed. 1981); D. Meiselman, *Attorney Malpractice: Law and Procedure,* §§ 5:4, 5:6, 5:7 (1980) (discussing the injury, discovery, and occurrence rules). Although our *Hoffman* decision actually applied another statute of limitations which was in effect before the enactment of SDCL 15–2–14.2, the Court observed that the clearly expressed legislative intent of both SDCL 15–2–14.1 (medical malpractice) and SDCL 15–2–14.2 was to have the statute run from the date the alleged malpractice *occurred. Hoffman,* 374 N.W.2d at 122 (citing *Holy Cross Parish v. Huether,* 308 N.W.2d 575 (S.D.1981), and *Alberts v. Giebink,* 299 N.W.2d 454 (S.D.1980)). Under the "occurrence rule," as expressed by South Dakota's statute, a cause of action for negligently examining a title accrues at the time the attorney provides the client with the erroneous information, in effect, when the omission occurs. Meiselman, *supra* § 5:12, at 90 n. 14. Thus, in this case, South Dakota's "occurrence rule" statute of limitations would normally run from the time that Tappe rendered the erroneous title opinion, which was in February 1981, and the action would have been barred after February 1984.

I now address the continuing representation rule.

The running of our "occurrence rule" statute of limitations would normally be an easy matter to calculate from the date of an erroneous title opinion. Plaintiff, however, also presents us with the issue of whether the "continuing treatment doctrine" should be extended to prevent the statute of limitations from running in a legal malpractice action. Plaintiff argues that continuous representation occurred because of Tappe's disputed comment to him in March or April 1981 stating that Tappe would take care of the easement. Tappe's unsuccessful attempt to resolve the matter through South Dakota's congressional delegation in November 1984 could also be viewed by a jury as a continuing representation.

In applying the continuing treatment doctrine to medical professionals, we have held that a medical professional's continuing treatment of a patient, which serves as the basis for a malpractice action, prevents a statute of limitation from running until the treatment ceases. *Wells v. Billars,* 391 N.W.2d 668 (S.D.1986); *see also Alberts v. Giebink,* 299 N.W.2d 454. Other courts, which have applied the continuous treatment doctrine to medical malpractice actions, have extended it to legal malpractice actions. *Siegel v. Kranis,* 29 A.D.2d 477, 288 N.Y.S.2d 831 (1968); *see generally* Mallen, *supra* § 391. *See also Amfac Distribution Corp. v. Miller,* 138 Ariz. 155, 673 P.2d 795 (Ct.App.1983), *approved as supplemented,* 138 Ariz. 152, 673 P.2d 792 (1983) (applying the discovery rule); *Wall v. Lewis,* 393 N.W.2d 758 (N.D.1986) (applying the discovery rule); *McCormick v. Romans,* 214 Va. 144, 198 S.E.2d 651 (1973).

In the course of its recent development, the continuing representation doctrine has presented problems concerning the test to be applied in determining when an attorney's continuous representation terminates in nonlitigation matters and, consequently, when the statute of limitations begins to run.

It has been suggested that the time of accrual coincides with the date that the attorney's error becomes final and irremedial.... Thus, the inquiry is not whether there still exists an attorney-client relationship, but when the representation of the specific matter terminated.

Mallen, *supra* § 391, at 462–63 (footnotes omitted). In this case, the affidavits in support of the summary judgment raise a factual dispute over whether Tappe agreed to do something about the easement in 1981, which could have created the impression that something more was to be done and that he would proceed to accomplish it. Plaintiff states he noted the easement on the land and specifically questioned Tappe circa April 1981; and Tappe, he states, told him not to worry about same—that he, Tappe, would take care of it if it became a problem. No one disputes that when it became a problem, Tappe actively tried to take care of it but could not. *See Wells,* 391 N.W.2d at 671; *see also Dura–Bilt Remodelers, Inc. v. Albanese,* 86 Misc.2d 172, 382 N.Y.S.2d 455 (1976). Although Tappe's contact with the Fish and Wildlife Service and the congressional delegation in 1984 was more than three years after the earlier disputed contact with plaintiff, a jury might reasonably infer that Tappe was continuing to represent plaintiff through this period and was on call to do further work. A jury might infer from plaintiff's consultation with a second attorney that plaintiff himself terminated his relationship with Tappe. This Court will not draw such an inference, however, because in reviewing summary judgments, we are required to view all inferences most favorably for the nonmoving party, the plaintiff in this case.[4] Viewing all the facts most favorably for plaintiff, they could reasonably be interpreted by a jury as a mutual expression by both parties that the trust and confidence essential to the attorney-client relationship continued to exist between them in March or April 1981 and through 1984, that Tappe was on call or doing further work to correct the defects, and that their relationship had not terminated. *See Amfac,* 673 P.2d 795; *Wall,* 393 N.W.2d 758; *Brown v. Johnstone,* 5 Ohio App.3d 165, 450 N.E.2d 693 (1982); *McCormick,* 198 S.E.2d 651; *see also Basic Food Indus., Inc. v. Travis, Warren, Nayer & Burgoyne,* 60 Mich.App. 492, 231 N.W.2d

466 (1975) (termination of attorney-client relationship in litigation matter). Some of the factors to be considered in this case to determine whether the attorney-client relationship continued or had terminated are: (1) whether plaintiff, as a reasonable layman, believed that Tappe was to do more work; and (2) whether anything has occurred to destroy the essential trust and confidence between attorney and client. *See Brown,* 450 N.E.2d 693; Meiselman, *supra* § 1:3; J. Koffler, *Legal Malpractice Statutes of Limitations: A Critical Analysis of a Burgeoning Crisis,* 20 Akron L.Rev. 209 (1986); *cf. Noland v. Freeman,* 344 N.W.2d 419 (Minn.1984) (medical malpractice). These factors were for the jury to apply in resolving the factual dispute about what occurred in 1981, or at any other time that the relationship may have terminated. *See McCarthy Bros. Co. v. Hanskutt,* 29 S.D. 535, 137 N.W. 286 (1912) (issue of whether part payment of debt tolled statute of limitations was for jury to determine on special interrogatories); *see also Noland,* 344 N.W.2d 419; Mallen, *supra* §§ 123, 659. As *Hanskutt* suggests, 137 N.W. 286, special interrogatories to the jury may be necessary for a clear determination of the factual issues affecting the application of the statute of limitations and the continuing representation doctrine. *See also* SDCL 15–6–49.

Those instances of malpractice in which no remedial action can be taken by the doctor or lawyer to cure the alleged wrong present clearer cases of a "single act" of negligence, to which the continuous representation doctrine will not apply. *Compare Offerdahl v. University of Minnesota Hosp. & Clinics,* 411 N.W.2d 20 (Minn.App. 1987) (explaining four elements of "single act" requirements in medical malpractice actions) with *Collins v. Johnson,* 374 N.W. 2d 536 (Minn.App.1985) (medical malpractice). Although a negligently rendered title opinion may be a single act of negligence in some cases, the facts in this case, when viewed most favorably for plaintiff, raise a genuine issue over whether plaintiff

---

**4.** Recently, I decried the excessive use of summary judgments by trial courts in this state. *Wright v. Coca Cola Bottling Co.,* 414 N.W.2d

608, 611 (S.D.1987) (Henderson, J., specially concurring); *Rozeboom v. Northwestern Bell Tel. Co.,* 358 N.W.2d 241, 243 (S.D.1984).

reasonably believed that Tappe was continuing to represent him when he allegedly promised to correct the defects in the title. The factual disputes in this case affect whether the continuing representation doctrine should apply and thus toll the statute of limitations.

The trial court's summary judgment for Tappe on the grounds that the action was barred by the statute of limitations, SDCL 15–2–14.2, should be reversed. I would remand for a jury determination of the disputed factual issues and, therefore, respectfully dissent.